MEMORANDUM OF DECISION RE: TERMINATION OF PARENTAL RIGHTS PETITION
This case arises out of a petition filed with the Superior Court for Juvenile Matters in Willimantic on May 31, 2001, by the department of children and families (hereinafter referred to as the "petitioner" or "department") whereby the petitioner seeks the termination of the parental rights of Albert D. and Brenda D. to their now nine year old son, Brendan, who was born January 1993. Brendan's parents will be referred to herein as father or mother and collectively as the "respondents."
II. HISTORY OF PROCEEDINGS
Court proceedings originated in Willimantic on May 16, 2000, when the department filed a petition against the respondents alleging that Brendan was a neglected child in that he was being denied proper care and attention physically, emotionally or morally and was being permitted to live under conditions, circumstances or associations injurious to his well-being. General Statutes § 46b-120 (8)(B) and (C). On the day the neglect petition was filed, an order of temporary custody was issued by the court (Mack, J.) which was confirmed on May 30, 2000. Brendan was committed to the care and custody of the department on the grounds alleged in the petition on November 21, 2000 (Mack, J.) during a proceeding at which neither mother nor father appeared. Said commitment, which was initially for a period of one year, was ordered to be maintained until further order of the court on November 14, 2001 (Mack,J.), and on August 21, 2002 (Mack, J.). It remains in effect. On May 9, 2001, the court (Mack, J.) approved a permanency plan for Brendan consisting of termination of the parental rights of mother and father and adoption. The court made no finding as to whether continued efforts by the department to reunify Brendan with his parents were appropriate. On CT Page 15330-aa November 14, 2001, the court (Mack, J.) deferred such a finding.
Trial of the termination petition was held on September 5, 6 and 8, 2002. The court finds that mother and father have appeared and have court-appointed attorneys, as does the child. The court has jurisdiction in the matter. There is no proceeding pending elsewhere affecting the custody of Brendan. Respondents remain steadfastly opposed to the termination of their parental rights.
The petitioner has proceeded against the respondents on two of the statutory grounds provided in General Statutes § 17a-112 (j). The petitioner alleges that Brendan has been ~ found in a prior proceeding to have been neglected and the respondents have failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, the respondents could assume a responsible position in the life of said child. General Statutes § 17a-112 (j)(3)(B)(i). Additionally, the petitioner alleges that Brendan has been denied, by reason of an act or acts of parental commission or omission the care, guidance or control necessary for the child's physical, educational, moral or emotional well-being. General Statutes § 17a-112 (j)(3)(C).
During the trial, the court heard testimony from nine witnesses, to wit: an evaluating clinical psychologist, an evaluating psycho-therapist, a psycho-sexual evaluator, a domestic violence coordinator, a probation officer, the child's therapist, the department's caseworker, mother and father. Thirty-three exhibits were received in evidence, twenty-six from the petitioner, four from mother and three from father; the child's attorney offered no exhibits and called no witnesses.[2] The court, after reading the termination petition and summary of adjudicatory facts filed herewith, reviewing each of the exhibits, considering the testimony of each of the witnesses, assessing the credibility of all witnesses and considering the arguments of counsel for each of the parties, does make the following findings.
III. FACTS:
 A. Events Preceding Removal of Child
This family first came to the attention of the department on February 4, 2000, when Brendan's elementary school teacher reported seeing bruises on the child's cheek and arms alter an unexplained absence from school of one week. The child, who was then age seven, reported to the investigating caseworker and state police officer that the bruises were caused by his father hitting him and the absence was a result of the CT Page 15330-ab appearance and location of the bruises. The child further reported that father "hits him" and swears and yells at him and his mother. Father, who was not very cooperative with the investigation, referred to his son as "a little terror" (petitioner's Exhibit 10) and blamed the child for the department and law enforcement involvement. Father refused the department's request for home visits and both parents refused to sign a service agreement which, inter alia, provided that the parents would cooperate with the department, that mother would be the primary disciplinarian and that there would be no physical discipline of Brendan which would leave marks. As a result of this incident, father was arrested and charged with risk of injury to a minor and assault in the third degree.[3] Abuse was substantiated by the department.
On February 16, 2000, as part of its ongoing investigation, the department received information from the state of Massachusetts as to the criminal record of the respondents in that state. Those records revealed that both mother and father were convicted sex offenders. In April, 1988, father was convicted of rape of a child and indecent assault and battery of a child and received a sentence of fifteen years, suspended after two years served, followed by a term of probation that ended September 13, 1993. On the same day father was sentenced, mother was sentenced to fifteen years suspended and two years probation as a result of her conviction for the same offenses. In September, 1990, father pled to and was convicted of rape of a child and incest and three counts of indecent assault and battery on a child and mother was convicted of three counts of indecent assault and battery on a child. Each received a suspended sentence of ten years, followed by three years probation. Father's past convictions also included malicious mischief and two separate convictions for assault and battery with a dangerous weapon. Father refused to discuss his past offenses with the department investigator, stating that he no longer had to follow any court orders. Mother was also uncooperative on this issue.
On February 25, 2000, Brendan's school psychologist reported to the department that she observed a scratch on Brendan's face and multiple bruises on his body. The child had disclosed to the psychologist that father had squeezed him so hard that he couldn't breathe forcing Brendan to scratch his father which resulted in his father scratching him. Again, while the department and state police officers investigated the incident, father was uncooperative, became agitated and blamed the child for the incident. On March 9, 2000, a third call was made to the department from Brendan's school. The school social worker reported that she observed bruises on the child's arms, right knee and face and scratches on his neck. The child disclosed to her that his mother had hit him in retaliation of being hit by Brendan. The child also disclosed that CT Page 15330-ac his parents had instructed him not to speak further with department personnel. This incident occurred after father's arrest for the first incident. When officials attempted to question the respondents concerning the latest incident, father angrily demanded that his seven year old son pack his bags and leave with the department worker! The worker, however, was able to get father to calm down, thus despite father's emotional outburst, the child remained with his parents pending the conclusion to the latest investigation. The department was informed by a family relations officer familiar with father's three pending criminal charges that his office would not accept a referral as father showed no remorse for inflicting bruises on Brendan and blamed what occurred on his son's behavior.
On May 16, 2000, the concern that the department had, as to Brendan's safety and well-being while in the care of his parents, was significantly heightened by information the department obtained from the clerk of courts of Worcester, Massachusetts which contained more specific information as to the circumstances that resulted in the respondents having been convicted of sexual offenses. The offending conduct that precipitated the arrests and convictions resulted in mother and father losing parental rights as to four of their children and two other children of father. The 1988 convictions resulted from the sexual abuse by father of the respondents' then eight year old daughter while mother was present. While father was incarcerated for that offense, three other children of the respondents apparently disclosed sexual abuse, which resulted in the 1990 convictions. Following the 1990 convictions, mother and father were ordered to have no contact with the victims, i.e., their own children.
Given those confirmed incidents of physical abuse, the respondents' failure to cooperate and the con firmed details of their past sexually offending criminal history coupled with the emotional abuse if Brendan by his father, the department on May 16, 2000, sought and obtained the order of temporary custody.
 B. Brendan's Placement History
Upon removal from his parents' care. Brendan was placed in a department licensed foster home where his caretaker observed many bruises and reported that the child did not know how to shower. The child exhibited oppositional and aggressive behavior so egregious as to result in his removal after a three week stay.[4] Brendan was next placed in a second foster home where, again, after a three week stay, he was removed due to his aggressive behavior toward the other foster children. His third placement was at a therapeutic foster home where he lasted for two CT Page 15330-ad months; his removal resulted from his tossing a lit candle and hurling a knife at his caretaker. His next placement was at another therapeutic foster home where he stayed for a month but could not get along with other special needs children in the house and thus was removed by the department. In September. 2000. Brendan was placed in his fifth foster home, his third therapeutic foster home, where he managed to stay for several months, however, due to aggressive and assaultive behavior, including his expulsion from school for kicking and biting a teacher and the principal, he was removed. At that time. Brendan also hit and physically assaulted a respite caretaker.
On March 23, 2001, due to escalating and out of control aggressive and other concerning behaviors. Brendan was hospitalized at St. Mary's Hospital in Waterbury.
It is noteworthy that during Brendan's ten month stay in foster care, his caretakers reported that he engaged in sexually inappropriate behavior which included touching female breasts, trying to observe others undressing, peeking into bedrooms, using sexual profanity, touching his private parts and showing the same to other children. It was also reported that Brendan was wetting his pants and would do little or no wiping after toileting. Additionally, it was reported that Brendan experienced night terrors in which he lashed out with his arms repeatedly yelling "no." During his initial placement in non-therapeutic foster care. Brendan participated in two separate partial hospitalization programs administered by Natchaug Hospital at the Joshua Center, first in Brooklyn and then (due to a change in foster homes) in Montville. His participation covered the period from May 25, 2000, to June 16, 2000. Among the concerns noted at his initial evaluation were his aggressive and oppositional behavior at home and at school, hyperactivity, impulsivity, learning disability, a history of physical abuse and a suspicion of sexual abuse by his biological parents. His obesity and a history of asthma were also of concern. The admitting psychiatrist noted that Brendan "was clearly out of control and was unable to manage himself in the community without a very specialized and fairly high level of intensive support services to be made available to him." (Petitioner's Exhibit 25.) The discharge summary noted that the child was generally disruptive in group therapy, openly defiant to staff and, when corrected for his inappropriate behavior, the child kicked and punched walls, his discharge prognosis was "guarded."
After a five day admission to St. Mary's Hospital. Brendan was transferred to St. Francis Mt. Sinai Hospital in Hartford on March 28, 2001, where he remained until July 1, 2001. Brendan was a patient for that three month period in a locked acute care facility. The treatment CT Page 15330-ae goal apparently was to stabilize the child with a view toward discharge to a less restrictive facility. While in that facility. Brendan was diagnosed as suffering from post-traumatic stress disorder, attention deficit hyperactivity disorder, oppositional defiant disorder and pervasive development disorder.[5]
On July 1, 2001, Brendan was transferred to the so-called "ABC unit" at St. Francis Care in Portland where he remained until August 23, 2002.[6]
The child's therapist for the last six months of his stay at said unit did testify and facility records covering his admission to discharge were received into evidence.[7] The unit is a highly structured sub-acute residential facility and contains a special school on the grounds. The unit provides residential care and treatment of severely emotionally disturbed children who had failed multiple placements. The unit also provided for and treated child victims of physical and sexual abuse. The past tense has been employed herein because as of January, 2002, the unit was designated by the department to serve an older adolescent populace. Thus, for a full seven month period, at age nine. Brendan was the youngest resident in the unit and remained so until August 23. 2002, when the department finally transferred the child to a more age appropriate facility.
Brendan was eight when admitted to the ABC unit. His admitting psychiatric evaluation reflected his history of multiple foster placements, each of which ended in his removal due to his oppositional, aggressive or sexual behaviors. His estimated length of stay was three to six months. He was noted to present as a talkative and engaging child. On admission he was taking Clonodine and Zoloft, psychotropic medications which were prescribed at Mt. Sinai. In addition to receiving twenty-four hour care and supervision and the special educational program. Brendan participated in daily group and weekly individual therapy. Added to on-going diagnostic evaluations was intermittent explosive disorder; aggressive and inappropriate sexual behaviors were of major concern. It was noted that the child exhibited significant post-traumatic symptomology and possessed a biological predisposition to impulsivity and explosive behavior. Sexual abuse was suspected.
In March, 2002, Brendan's behavior exhibited a dramatic decline in that both his aggressive and sexual behavior increased in frequency and severity. The child was experiencing sexualized dreams, however he refused to discuss their content other than to indicate that the dream involved parent/child sexual acts. His aggressive behavior was such that in March, seven protective "holds" were necessary to restrain him and he was "locked in seclusion" on one occasion. In April, six such holds and another lockdown were required to restrain him. It is noteworthy that CT Page 15330-af during this period, visits by Brendan's parents were on the decline. During his last six months in Portland, Brendan's therapist had no face-to-face contact with either parent and testified that, although they were allowed bi-weekly visits, in his last six months, mother visited on two or three occasions and father on one or two only. The failure of the respondents to make the scheduled visits was, according to the therapist. "very distressing" and produced anger and tears.
By mid July, 2002, with changes in medication and with instruction and redirection, Brendan's inappropriate sexualized behaviors decreased and sexual conversation lessened, however, the child continued to become agitated with any attempt by his therapist at discussion of sexual issues. The child had great difficulty maintaining personal boundaries. Although there were sporadic tantrums, a significant decrease in Brendan's volatile and aggressive behavior was noted. The child was more open in disclosing and describing his feelings and concerns. The lack of visits from the respondents, however, remained very problematic for this child who was then verbalizing not only his sadness at not seeing his parents, but was expressing his concern as to his safety if returned home. Brendan, who is a large child for his age, had put on significant weight while at the ABC unit. His weight on admission was 102 pounds. It increased to 139 pounds in nine months. Brendan was placed on special dietary programs and by the time of his discharge, his weight was decreasing.
Brendan's therapist stated that Brendan has consistently denied that his mother and/or hither were sexually involved with him, however, based on her treatment history and therapeutic relationship with Brendan and her twenty-eight years of experience as a licensed marital and family therapist, she opined, with a reasonable decree of certainty, that this child witnessed adults engaging in sexual acts and "potentially" adults engaged in such acts with children. She testified that Brendan has "an understanding of sexual activity well beyond his age" and that the child is a victim of sexual abuse. "at least, in a vicarious way."
As noted, although the population at the ABC unit in Portland changed in January. 2002. Brendan was not transferred out of said unit until eight months thereafter.[8] The department, immediately upon the designated change, placed Brendan on a waiting list for professional foster care, however, due to the lack of availability of a foster placement appropriate for Brendan's needs and the then decompensating behavior exhibited by the child, a longer stay at St. Francis Care was deemed necessary until a less restrictive residential facility was located and Brendan stabilized at the ABC unit. CT Page 15330-ag
On July 29, 2002. Brendan had an interview at Harmony Hills School in Rhode Island. That potential placement, however, was lost due to the refusal of the respondents to execute the releases necessary for admission. Another potential placement was identified and on August 7, 2002, Brendan was accepted at the Hillcrest Educational Center in Pittsfield, Massachusetts where he currently resides.[9] Hillcrest specializes in treating children with a history of sexualized and aggressive behavior. The typical length of stay in the program is one to two years. It was reported to Brendan's therapist that the child was "struggling" which was no surprise to her as, she stated. Brendan is resistant to and experiences difficulty with change.
 C. The Professional Evaluations
On June 29, 2000, Diane Cox-Lindenbeaum conducted a social-sexual evaluation of Brendan. Cox-Lindenbeaum is a psychotherapist of thirty years experience who specializes in consultation and evaluation relative to child sexual abuse. This expert testified that the child told her that his mother and father hit him. The child blamed himself for breaking up his family. Brendan loved both his parents, although less connected to his father, however, the child "accepted" the physical abuse perpetrated by those parents. During her interview with Brendan, the child exhibited "a visceral emotional reaction" when the evaluator attempted to show drawings of naked males and females. Stating that these non-stimulating sketches were "disgusting," Brendan hid under the table and with his eves closed, assumed a cowering and frightened fetal position. His absolute abhorrence of any healthy sexuality precluded Cox-Lindenbeaum from going any further with her evaluation as, she stated, to do so would have been damaging to the child. The evaluator noted several "high risk indicators" of possible sexual abuse which included his parents' history of child sexual abuse. Brendan's reported sexualized behaviors, reported encopresis and enuresis, inappropriate touching of adults and his abhorrence of sex. It was this expert's opinion that "hitting was a way of life" for this child and that he was definitely a victim of physical abuse. Cox-Lindenbeaum also was of the opinion, within a reasonable decree of psychological probability, that Brendan was a victim of sexual abuse. Based upon her findings. Cox-Lindenbeaum recommended that visitation of Brendan with his parents be deferred pending psychological evaluations of the Parents. As to the issue, the evaluator concluded in her written report:
 This child has been abused. Although bonded to parents by nature, he is still subject to their rejection which may cause long-term emotional reactions. Before any visitation occurs which, must be supervised, CT Page 15330-ah parents must be evaluated as to their emotional capacity to support this child. The fathers rage in disengaging from this child and the mother's collusion in the child's rejection must be taken into consideration as to their ability to parent this young child.
Petitioner's Exhibit 16.
Subsequent to Cox-Lindenbeaum's evaluation, Dr. David Mantell performed three court-ordered psychological evaluations that included mother, father and Brendan. Mantell also testified at trial. The initial evaluations were of all three persons and were performed on September 6, 2000. As of that date, the respondents had not seen Brendan since his removal four months prior thereto, although they were allowed by the department a phone visit in July. During the parent-child interactional phase of the evaluation. Mantell noted that the parents and child related well, also noting that Brendan was presented with many gifts, however, once they parted company. Brendan had no difficulty leaving them. At the time of his evaluation, father was forty-five, had a limited work history and suffered from a herniated disc, bi-lateral carpal tunnel problems and a history of heart difficulties. Mantell's initial impression was that father exhibited a generalized anxiety disorder and possessed a negative, paranoid and avoidant personality. Mother was age forty-four and suffered from heart and thyroid problems. Mantell's impression was that she exhibited a major depression and generalized anxiety disorder coupled with dependent, histrionic and paranoid personality traits. In his evaluation of Brendan, who was then age seven. Mantell noted his large head, small neck and his obesity and suspected some genetic involvement along with the reported emotional, behavioral and self-regulatory difficulties. Considering the child's clinical level of aggressive behavior, his impulsivity, his nightmares and his temper tantrums. Mantell's diagnosis included attention deficit hyperactivity disorder (ADHD) and a disruptive behavioral disorder; physical abuse was deemed a significant factor along with features of psychosocial and psychosexual immaturity. Mantell recommended that Brendan be committed to the department's care and custody and that the respondents commence bi-weekly supervised visitation. Noting that the information obtained from Brendan's parents was not reliable, Mantell, in his written report concluded:
 My sense is that the parents do not understand the child, do not understand his specialized needs and are very much preoccupied with their own medical and psychological circumstances.
CT Page 15330-ai
Petitioner's Exhibit 20.
As a result. Mantell opined, their ability to provide appropriate care for Brendan was impaired. In his concern as to the ability of the respondents to effectively parent their child. Mantell stressed mother's overprotectiveness as conflicting with father's harsh approach to disciplining the child.
Six months after concluding his initial evaluation. Mantell again evaluated the respondents, this time in a more specific fashion vis-a-vis their history. Father would only minimally discuss the 1984 incidents with his then eight year old daughter admitting that he touched and fondled her, but denying, despite his 1990 convictions, any sexual activity with his other children. Father also denied allegations by an older child that, in 1999, he forced her to view videos of a sexual encounter and engage in other inappropriate sexually-related activities, protective As to the parenting of Brendan, father accused mother of being over-protective and stated that mother aided the child undressing, allowed him to sleep late and gave him snacks before dinner — all of which father objected to, but was ignored. Father denied that while residing at home Brendan was violent and stated to Mantell, "now he is an animal!" Mother also denied that Brendan, while with them, had been aggressive, although she confirmed behavioral and attention problems at school. Mother denied that she was present when father committed the 1984 offense with their then eight year old and avoided any questions on that issue. Mother did confirm that the child refuses to go to bed, has difficulty sleeping and refuses to get up. Mantell suspected a "fundamentally strong element of disharmony and conflict" between mother and father as to both child-rearing and adult relationship issues. Noting that the level of disturbance in both mother and father was "serious and chronic." but the level of paraphilia unclarified. Mantell concluded:
 Both parents are clearly under great stress. The father articulated this well indicating what it means for him to have become re-involved with the State on account of a child welfare issue. But is also clear that Brendan was receiving an unusual and atypical upbringing that is emotionally harmful to him and which is contributory to his emotional and behavioral disturbances because of inappropriate child rearing practices as well as physical abuse. It is unclear whether the child has been compromised in other ways.
Petitioner's Exhibit 21. CT Page 15330-aj
Mantell recommended that the parents participate in parenting classes, marriage counseling and that mother remain engaged in her mental health counseling and that father undertake such counseling. A psychosexual evaluation was recommended for both parents and visitation was to remain supervised. Mantell predicted that it would be "challenging to maintain a working relationship with mother and father."
Mantell's third evaluation of Brendan's parents took place on October 26 and November 29, 2001, as a result of which Mantell found that the parents' situation was more insecure and unstable than at the time of the previous two evaluations. Respondents had made no therapeutic progress, were uncooperative with the department and admitted that they were not able to provide appropriate care or an appropriate residence for Brendan and had no idea when they would be in a position to do so. Mantell noted a strong continuing bond between Brendan and his parents, however Mantell also noted that the mother-child relationship was "emotionally enmeshed when not in deep conflict" while the father-child relationship was based on fear. Mantell concluded that neither parent possessed minimally acceptable parental capacities let alone those necessary to provide appropriate and safe care for a child such as Brendan who required strong therapeutic supports. Mother and father had resided in a one room apartment for over one year; mother last worked in 1 994, father last worked in 1990; mother was receiving social security disability benefits for depression, father was receiving state assistance on mother's account. The marital relationship was conflicted with father attempting to control mother in all aspects of her life and mother rebelling and leaving father on several occasions only to return. As to that relationship Mantell concluded:
 Both parents present with strong histories of Axis I and II disorders. Both are emotionally unstable. Their life situation has multiple stressors including medical, financial, relational. and residential, and both are unemployed, without constructive or stabilizing formats of their lives, both interdependent upon one another, and not able to manage together or individually. Both are fearful of being alone and neither appears to have the wherewithal to reconstruct their lives. Additionally, they are both convicted sexual offenders with all of the attending difficulties this brings. They find it hard to get housing and it might be difficult for them to find employment if they were actually looking. Both feel medically disabled from work. They seem to be CT Page 15330-ak hanging on by a thread.
Petitioner's Exhibit 23.
On August 20, 2001, a psycho-sexual evaluation of mother and father was performed by Scott Stevens who testified at trial. The evaluation was arranged by the department, however. Stevens was also contacted by father's probation officer, who desired to be provided with the results. Stevens has been a licensed and certified marriage and family therapist since 1983 and conducts a private psychotherapeutic practice specializing in physical and sexual abuse and post-traumatic stress disorder, among other things. He has performed numerous forensic evaluations. Neither mother nor father was very cooperative in scheduling or in participating in the process. Father cancelled an appointment and was one hour late for the appointment he kept. Father told the evaluator that too many other activities required his attention. During the evaluation, father was rude and refused to answer any questions related to his past sexual misconduct with his own children. As to questions related to ether areas, father refused to answer, was defensive or could not recall. Mother also exhibited many lapses of memory and exhibited a high degree of defensiveness and minimization. Mother denied any participation in the events o 1984 and 1990 involving her children, a denial which is contrary to Massachusetts court records and father's statements to the evaluator. Stevens also found mother to be "an inaccurate historian."
Stevens expressed serious concern as to mother's ability to protect Brendan as she was "overly involved" with the child. Stevens questioned mother's ability to set appropriate limits on Brendan and was alarmed at the results of some of the psychological testing which revealed mother's sexualized view of children. Stevens concluded that mother needed to "emotionally differentiate herself" from Brendan. Stevens was particularly alarmed by mother's failure to disclose the history with her older children to a therapist whom mother had been seeing for six months. That failure, Stevens opined, would significantly reduce the therapist's ability to be helpful to mother. Stevens concluded:
 [Mother] continues to suffer from serious psychological issues. including depression, and is probably being subjected to domestic abuse by her husband. Both of these issues should continue to be addressed with an outpatient psychotherapist and prescribing psychiatrist. However, these providers can only be the most help to her if she regular[ly] attends sessions an (1 they are provided with all available information.
CT Page 15330-al
Petitioner's Exhibit 18.
As to father, Stevens noted that father blames mother for his arrest as a result of hitting Brendan. Father told the evaluator that mother coddles the child. He expressed his willingness to participate in marriage counseling so that others would see what he has to go through with mother. Father denied any need for sexual offender treatment or anger management. Stevens, on the other hand, felt that father's history clearly revealed significant lack of impulse control concerning anger and sexual behavior and that he minimized both aspects of his behaviors, of great concern to Stevens was father's impulsivity, his control over mother and his physical abuse of Brendan for which he took little or no responsibility. Father's defensiveness and refusal to discuss allegations of past sexual misconduct with his children were also of concern as Stevens opined that the evaluation may underestimate father's past inappropriate sexual behavior and his current functioning. Stevens reported that father was in need of long term psychiatric and therapeutic intervention on many issues, however, Stevens expressed uncertainty as to father's ability to commit to therapy and treatment.
Due to father's refusal to answer many questions and his willingness to discuss multiple allegations of inappropriate sexual behavior. Stevens found it difficult, as with mother, to provide a fully informed opinion as to father's current and future sexual functioning. Stevens concluded:
 What is more clear is [father's] pattern of impulsive acting out on those around him; in many cases violently and in other cases sexually. Until he is willing to take more responsibility for his own actions and address what role his actions play in problems which occur for him in his relationship with Brenda and other people around him, he is likely to continue to experience significant distress and chaos in his life and is probably not in a position to provide a stable environment for a child. Finally, to again echo Dr. Mantell's conclusion, it will be very difficult to develop the level of trust with father necessary to achieve these ends, given the high level of self-defeating behavior in which he engages.
Petitioner's Exhibit 19.
Stevens testified that, although he could not rule out that Brendan was sexually abused by his parents, the child clearly was physically abused. CT Page 15330-am He stated his opinion that mother and father posed a significant danger to their son in that their parenting skills were opposite and severely limited.
 D. The Court-Ordered Steps
On May 30, 2000, at the court hearing at which the order of temporary custody was confirmed, the court (Mack, J.) issued specific steps which were signed by mother and father. Pursuant to General Statutes §46b-129 (j) on November 21, 2000, at the hearing at which Brendan was committed, the court reordered said steps in the absence of the respondents who failed to appear. Immediately above the signature of each of the parents and below that of the judge is the following language:
 As the above-named respondents I hereby agree to cooperate with the above conditions approved and ordered by the court and recognize that non-compliance with these steps result in modification of the existing order or disposition. I acknowledge that failure to achieve these specific steps will increase the chance that a petition may be filed to terminate my parental rights permanently so that my child may be placed in adoption. I understand that I should contact my lawyer and/or DCF worker if I need help in reaching any of these steps.
(Emphasis added.)
These statutorily mandated steps provide parents whose children are in the custody of the department with a road map which they must diligently follow in order to be in a position to provide appropriate, safe and nurturing care for their children and, thereby, secure their return to parental care and custody. In this case both mother and father were to cooperate with department home visits; keep all appointments set by or with the department; participate in individual, family and parenting counseling; submit to substance abuse assessment; testing and, if necessary, treatment; follow service provider recommendations; sign releases to allow the department to communicate with the service providers; secure and/or maintain adequate housing or income and have no further criminal involvement. Respondents were to provide confirmation of past sexual offender treatment and to provide the appropriate documentation through counsel. If not able to provide that documentation, the respondents were to comply with a sexual evaluation and treatment, if recommended. In addition to those mutual specific steps, mother was, through counseling, to learn appropriate methods to CT Page 15330-an correct Brendan's behavior and to understand ADHD issues. The department was to refer mother to Day Kimball Hospital for individual and psychiatric treatment and to United Services or New Perceptions for an advanced behavior health (ABH) evaluation and treatment, if needed, and parenting classes. Father, in addition to the counseling ordered for both parents, was to participate in anger management classes, if recommended by his individual therapist. The department was to refer father to United Services for parenting classes. New Perceptions for the ABH evaluation and Northeast Clinical for anger management classes. father was to seek individual counseling with a provider of his choice.
The level of cooperation with the department by the respondents leaves much to he desired. Throughout the pendency of this case they have consistently refused to respond to letters from the department, phone calls, and requests through counsel to execute in favor of the department those releases necessary to implement services to the parents. Mother did sign a release in June, 2002, allowing the department to obtain information from a therapist she was seeing prior to Brendan's removal. Mother, however, refused to sign any further releases until May, 2001, when the court approved termination as a permanency plan. father signed the necessary release for the ABH evaluation through United Services in June, 2000, but likewise refused all other department requests until after the approval of the permanency plan. Up to the date the trial commenced, father was still refusing to identify the physician who was prescribing his medication. Father also refused to sign a release to permit the department to communicate with the provider of a criminal court-ordered domestic violence program in which father participated. As noted both mother and father refused to sign the documents necessary for Brendan's admission to Harmony Hill. In December, 2000, the respondents refused home visits to the department, the scheduling of which prior to that time was problematic. Since January, 2001, neither parent has attended an administrative case review. Both parents have refused to undergo a substance abuse evaluation, despite father reporting that mother is mixing alcohol with her medications. Since Brendan's removal both parents have had encounters with the criminal justice system. Mother was arrested and fined for shoplifting; a failure to register as a sexual offender charge is pending. Father was also arrested for failure to so register; a violation of probation charge is pending. Father was convicted of assault in the third degree on June 27, 2000, and received a suspended sentence of one year with two years probation. The violation charge is as a result of allegedly violating the conditions of that probation. The conviction was from an incident in which father attacked a man who offered mother a cigarette.
Although the respondents completed a seven session parenting class over CT Page 15330-ao a six month period and intended to repeat the classes, their compliance with the individual and family counseling requirements fell far short of what they needed to do. At the time of Brendan's removal, mother was seeing a therapist for depression at Day Kimball Hospital, however, her attendance was inconsistent and she disengaged in November, 2000. Mother did not resume therapy until May, 2001, when she participated in a program offering individual therapy twice a month and medical review once a month. Records indicate that mother attended eight sessions, failed three and cancelled two. Mother testified that she missed five sessions in the past six to seven months and that she had not attended at all in the past two months. Father has failed to engage in any individual and family counseling, although he and mother did meet with an individual counselor for two sessions and consulted with a "pastoral" counselor, each of whom determined that mother and father required experience and expertise beyond their abilities to provide.
Father was ordered, as a condition of his probation, to participate in a court sanctioned twenty-six week domestic violence program in New London. The facilitator testified that between September, 2001 and April, 2002, father missed nine out of nineteen sessions. Father was uncooperative, argumentative and revealed a negative attitude. While in the program, father admitted to domestic violence as to mother and as to Brendan. Written reports from the facilitator noted that father had a closed mind, was unwilling to change and took no responsibility for his past abusive behaviors. (Petitioners Exhibit 15.) The facilitator also reported that father "made a mockery of the judicial system" in that he refused to do homework assignments and refused to pay the $45 entry fee and the $5 per session fee or to perform community service in lieu thereof. Father was terminated from the program due to absenteeism and non-compliance with the rules thereof. Mr. Gulick, father's probation officer, testified that the violation of probation charge was based, not only on the failed domestic violence program, but also on father's failure to provide his address; his failure to report as required and the then new arrest for failure to register as a sex offender.
As noted, the respondents have been unable to secure adequate housing. They still reside in a rooming house in a one room residence. Their sole source of income is social security disability and state assistance.
Until August 20, 2001, a period of fifteen months from the date of Brendan's removal, the respondents refused to participate in a psychosexual evaluation that was mandated by the court-ordered steps. This evaluation was required because the respondents refused to provide the department with confirmation and documentation that they had participated in past sex offending treatment. CT Page 15330-ap
Moreover, in June, 2001, one month after the approval of the permanency plan, the respondents refused to sign additional steps which would specify couples therapy and that evaluation. As of August 8, 2002, the department reported that the parents continued to be "uncooperative." (Petitioner's Exhibit 7.)
 E. Visits With Brendan
As noted, due to the departments concerns as to physical abuse and possible sexual abuse, the respondents did not see Brendan for a period of four months from his removal. Pursuant to Mantell's recommendation in September, 2000, bi-weekly supervised visits commenced in October, 2000. The department transported the respondents to the site of the visits. The visits took place at the department office in the locale of the child while he was in foster care. While Brendan was at Mt. Sinai, however, and in the child's presence, father became quite agitated over Brendan's lethargic behavior due to his medication, lost his temper, yelled and clenched his fist. During the ride home, father's agitation continued and when the transportation aide attempted to discuss father's behavior, father hit the dashboard with his fist, persistently refused to speak and demanded that the vehicle be stopped to allow him to exit the same. This incident, which occurred, in April, 2001, resulted in the department's refusal to continue to provide transportation to father due to concern for the safety of department personnel in light of father's volatile behavior. From then on, however, the department offered the parents bus passes and mileage reimbursement. It is noteworthy that the department intends to provide transportation to the parents to see Brendan at Hillcrest, however two transportation aides will be required along with strict adherence to behavioral standards. Brendan's parents did not make many of the visits once Brendan was transferred to St. Francis Care in Portland. Neither had a car or a driver's license and they were unwilling to endure a two hour wait in Hartford to take the bus from Willimantic to Portland. The parents offered health and insufficient time to see Brendan as reasons for the sparsity of their visits. At times, a friend would transport them to the visits. As noted, visits by the respondents, were virtually non-existent during the child's last six months in Portland, a fact that was severely distressing to Brendan.
When the respondents did make a visit, however, they would shower the child with toys and food items that were contrary to his dietary needs. According to Brendan's therapist, who recalled only one parental visit during Brendan's last two months in Portland, the visits were all about material items with little or no discussion of Brendan's school and other activities or how the child was feeling. Especially disturbing to the CT Page 15330-aq therapist was the respondent5Z failure to contact the facility to inform Brendan that a scheduled visit would not take place. The therapist testified that Brendan had "a relatively superficial relationship" with his mother and father.
IV. ADJUDICATION:
For the purposes of adjudication the court is limited to consideration of those events which preceded the filing of the present petition. Practice Book § 33-3. The adjudication is therefore. May 31, 2001. However, the court may consider material provided in the four department social studies received into evidence, even though prepared after the filing date, so long as the events considered took place prior to the adjudication date. In re Tabitha P., 39 Conn. App. 353, 368 (1995). The disposition date is the date that the trial concluded and the decision was reserved., i.e., September 8, 2002.
 A. Reasonable Efforts
Prior to the court's consideration of the statutory grounds alleged by petitioner to provide the basis for the termination of the respondent's parental rights and prior to consideration as to whether such termination is in the best interest of Brendan, this court must consider the "reasonable efforts" findings required by § 17a-112 (j)(1). That section provides that in order for the court to grant the termination petition, it must find by clear and convincing evidence that the department has made reasonable efforts to locate the parents and to reunify the child or children with the parents. In lieu of that finding, the court may find, by clear and convincing evidence, that the parents are unable or unwilling to benefit from reunification efforts.
In the termination petition, the department alleges that it has made reasonable efforts to reunify Brendan with the respondents, but the respondents are unable or unwilling to benefit from such efforts. The Appellate Court has referred to the word "reasonable" in this statutory context as the "linchpin" in adjudging the efforts by the department under the circumstances of the particular case. In re Rachel M.,58 Conn. App. 448, 450 (2000) Id. The court has stated that the department's obligation hereunder is to do everything reasonable and that the department is not expected to do everything possible. In re Eden F.,48 Conn. App. 290, 311-312 (1998), rev'd on other grounds, 250 Conn. 674
(1999). Reasonableness is an objective standard and the issue of whether the efforts made by the department were reasonable depends upon the courts consideration of all of the circumstances in this case. In reHector L., 53 Conn. App. 359, 372 1999). CT Page 15330-ar
The department offers as evidence of its efforts to reunite Brendan with his parents its procurement of the following services: a social-sexual evaluation of the child (Cox-Lindenbeaum); a psycho-sexual evaluation of mother and father (Stevens); several psychological evaluations, including that of Brendan (Mantell); transportation of the parents to visitation; supervised visitation; substance abuse evaluations; counseling services; parenting classes; appropriate placement, educational, and treatment services for Brendan; vouchers for public transportation, medcab; telephone cards; food and case management services. Prior to the issuance of the order of temporary custody, services were offered by the department which were rejected by mother and father. On November 21, 2000, and again on May 9, 2001, Judge Mack found that the department had made reasonable efforts to reunify Brendan with his parents.
Father needed to appropriately address domestic violence and needed to gain better control over his impulsive, combative and volatile behavior. Father needed to address his sexually-off en ding past conduct in individual therapy and his conflicted marital relationship in couples therapy. Instead of directing his attention to these matters, father directed his attention to frustrating attempts by the department to obtain a history of his past behavior so as to identify for prospective therapists the issues to be addressed. He refused to sign releases and he participated in no services other than a basic parenting program. His volatile and disturbing behavior during a visit with his son and the ride home resulted in the loss of the department's transportation services.
He was only minimally cooperative with the professional evaluations and totally uncooperative with the domestic violence program ordered by the criminal court.
Mother also needed to address issues of domestic violence and marital discord. She needed to deal with alleged alcohol abuse and needed to stay engaged and diligently attend her on-going therapy. Mother was not consistent in attending her therapy and failed to inform her therapist of her sexually-offending past. Mother also refused to cooperate with the department. She refused to sign appropriate releases, refused a substance abuse evaluation and refused home visits. With the exception of the parenting classes and her minimum participation in her therapy, mother accessed no other services. She too was uncooperative with the professional evaluations.
Due to Brendan's special needs as evidenced by his aggressive, oppositional and impulsive behavior and his inappropriate sexually-related CT Page 15330-as conduct, he requires exceptional parenting by parents who possess skills far above those of his mother and father. Respondents, by their lack of cooperation with the department, the evaluators, the service providers and the courts, have completely sabotaged any and all efforts by the department and its service providers to acquire anything close to the skills required to properly and safely parent Brendan.
This court finds by clear and convincing evidence, that the department has made reasonable efforts to reunite Brendan with the respondents and that they are unwilling and unable to benefit from said efforts.
 B. Failure to Rehabilitate
As indicated, the petitioner alleges that the respondents have failed to achieve the level of rehabilitation necessary to be responsible parents to their child. Before this court reaches the issue of whether termination of mother and father's parental rights is in the best interest of said child, the petitioner must prove by clear and convincing evidence one of the two statutory grounds alleged.
Section 17a-112 (2)(3)(b)(1) allows for the involuntary termination of parental rights when "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding . . . has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child. . . ." In reStanley D., 61 Conn. App. 224, 229 (2000).
"To terminate parental rights for failure to achieve rehabilitation, both prongs of the test incorporated in § 17a-112 (j) must be met: one, that the parent has failed to achieve rehabilitation and two, that there is no reason to believe that the parent could assume a responsible position in the life of the child within a reasonable time, considering the age and needs of he child." (Emphasis in original.) In re Danuel D.,51 Conn. App. 829, 843 (1999).
In the case of In re Eden F., 250 Conn. 674, 706, rehearing denied,251 Conn. 924 (1999), our Supreme Court defined "rehabilitation" as follows:
 `Personal rehabilitation' as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [Section 17a-112] requires the trial court to CT Page 15330-at analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable `within a reasonable time.' "Rehabilitate' means to restore [a handicapped or delinquent person] to a useful and constructive place in society through social rehabilitation. . . . The statute does not require [a parent] to prove precisely when she will be able to assume a responsible position in her child's life. Nor does it require her to prove that she will be able to assume full responsibility for her child. unaided by available support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation she has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date she can assume a responsible position in her child's life.
(Citations omitted; internal quotation marks omitted.)
In assessing rehabilitation the issue is not whether the parent has improved [his] ability to manage [his] own life but whether [he] has sufficiently achieved the ability to meet the particular needs of his children. In re Shyliesh H., 56 Conn. App. 167, 180 (1999). The court must review the past and present status of Brendan and view the parenting abilities of his parents from a historical perspective. See In re TabithaP., supra, 39 Conn. App. 361. The inquiry is not whether they are now or may in the foreseeable future be able to meet the needs of a child of normal development, but whether they are now or may in the foreseeable future be able to meet the particular needs of Brendan. In re Luis C.,210 Conn. 157, 167 (1989); In re Samantha B., 45 Conn. Sup. 468, 477
(1997), aff'd. 51 Conn. App. 376 (1998), cert. denied. 248 Conn. 902
(1999). The parents' personal rehabilitation is to be determined, in part, by the extent to which they complied with the specific steps issued by this court. See In re Shyliesh, supra, 56 Conn. App. 179. "In the adjudicatory phase, the could may rely on events occurring after the date of the filing of the petition to terminate parental rights when considering the issue of whether the degree of rehabilitations is sufficient to foresee that the parent may resume a useful role in the child's life with a reasonable time." (Emphasis in original.) In reStanley D., 61 Conn. App. supra, 230; see also In re Latifa K.,67 Conn. App. 742, 748 (2002).
The department became involved with Brendan and the respondents in early February, 2000, as a result of a report from school personnel of CT Page 15330-au suspected physical abuse. By the time the order of temporary custody was issued in May of that year, the department had investigated and confirmed three separate incidents of physical violence perpetrated by the respondents, two involving father, one involving mother. The department also confirmed emotional abuse of the child when father told him to leave. The department also became aware of the respondents sexually-offending history.
Once Brendan's custody was vested in the department, the department soon discovered, through reports and mental health evaluations, that Brendan was a child who required very special care due to his disruptive behaviors which were aggressive, oppositional and impulsive. From reports of several foster parents, the department learned of his very inappropriate sexually-related behaviors which have been hereinbefore described. From Cox-Lindenbeaum's evaluation in June, 2000, the department learned of his absolute and frightening abhorrence of relatively innocuous anatomical sketches of naked people. By the time of Mantell's evaluation in September, 2000, Brendan had disrupted and was removed form four foster homes, two of which were therapeutic foster homes, and had failed two partial hospitalization programs. His aggressive and disturbing sexual behaviors were escalating. Both Mantell and Cox-Lindenbeaum confirmed that Brendan was physically abused by the respondents, particularly by his father. Cox-Lindenbeaum suspected the child was also a victim of sexual abuse. Mantell noted Brendan's unusual physical appearance (obesity, large head, small neck) and diagnosed ADHD with features of hyperactivity, impulsivity and inattention; a disruptive behavioral disorder and victimization by physical abuse. Brendan was, at the time of his removal, and is now a child who requires a caretaker with the appropriate skills to deal with his very special needs. Since March, 2001, up to the time of trial, he has required hospital and residential settings to tend to those needs.
Shortly after Brendan's removal from their care, respondents were provided with the court-ordered steps which were reconfirmed six months later when, by default, the child was committed to the care and custody of the department. This court has previously noted herein both the importance of the specific steps in promoting reunification of Brendan with his mother and father and the failure of the respondents to comply with those court orders. Mother and father needed to cooperate with the department. They needed to fully disclose and allow information to be obtained concerning their past behaviors which resulted in the termination of their parental rights to other children. They needed to fully engage in therapeutic services to deal with their mental health issues and their relationship difficulties. They needed to avoid further involvement with the criminal justice system. They needed to understand CT Page 15330-av Brendan's disturbing behavior's and accept the fact that their present and past parenting practices may have been the catalyst for said behaviors, if not the outright cause. Most importantly, they needed to let Brendan know that they would be there for him by visiting him as often as permitted and complying with the transportation and visitation behavioral rules.
As of the adjudication date, May 31, 2001, Brendan had been in state custody for in excess of one year, yet his mother and father had made little or no effort to cooperate with the department and commence doing what they needed to do. They remained defensive and offered little information about their past criminal behavior; each had been arrested for new criminal offenses. Shortly after Brendan's commitment, they refused home visits and failed to attend administrative case reviews. At the same time, mother terminated her mental health counseling. Father did not engage in any counseling. The respondents accessed no services other then basic parenting classes.
Mantel reported in September, 2000, during his initial evaluation of Brendan and the respondents, that he perceived strong relationship difficulties between parents and child and between mother and father. He concluded that Brendan "has specialized characteristics that are beyond the parents' childcare ability now." He opined that the inability of the respondent to meet Brendan's special needs was also due to their "emotional characteristics."[10] Six months, thereafter, during his second evaluation, Mandell noted the fundamentally conflicted relationship between the respondents not only related to Brendan's care, but also to their adult relationship. He concluded that the respondents conflicted child-rearing practices contributed to Brendan's inappropriate behaviors. Mantell's recommendations as to parental services echoed the specific steps ordered by Judge Mack nearly one year prior thereto, steps that the respondents chose not to follow. As of the adjudication date, the respondents were no closer to achieving that level of rehabilitation necessary to properly and safely parent Brendan than they were when he was removed from their care one year prior thereto. In re PassioniqueT., 44 Conn. Sup. 551, 564 (1996); In re Hector L., supra,53 Conn. App. 367. This court therefore finds that the petitioner has proven by clear and convincing evidence the first prong of the statute, namely, the failure of the respondents to achieve the requisite rehabilitation level.
The court must now address the second statutory prong and make a determination as to whether, given a reasonable time and given the age and needs of their child, the respondents could assume a responsible position in Brendan's life. As noted, in its consideration of this CT Page 15330-aw foreseeability issue, the court may rely on post adjudicatory events. This court has already discussed the special needs of Brendan as evidenced by his emotional and behavioral history. Brendan is now nine years of age and has been out of his parents' custody for two and one-half years. He has been institutionalized, due to his disturbing and out of control behaviors, for in excess of one and one-half years. Since his removal, the respondents have failed to take the steps necessary to present themselves as an appropriate custodial alternative once Brendan is discharged from residential or therapeutic care. They have essentially remained uncooperative with the department up to and including the commencement of trial.[11] Mother re-enrolled in individual counseling yet her commitment to the process and her attendance was poor. Father participated in a criminal court-ordered domestic violence program, however, he was obstinate and totally uncooperative in that process, resulting in a violation of probation charge. Respondents substantially curtailed their visits with Brendan, much to the disappointment of their child, offering flimsy excuses for their failure to see their son. Mantell's third evaluation of the respondents was performed in the fall of 2001. At that time. Mantell found the relationship between the respondents and found their life circumstances even more unstable than at the time of the earlier evaluations. The respondents admitted they were in no position to care for Brendan and neither could say when he or she would be in such a position. Their one room apartment, their deteriorating health, their minimal income, their marital discord, their criminal involvement, all contributed to their unstable circumstances. Mantell recommended termination of parental rights, not because of suspected sex abuse of Brendan, but due to respondents' "very, very poor progress" in accessing recommended therapeutic services and what Mantell determined was a "hopelessly unstable" relationship between Brendan and the respondents and a deteriorating, conflicted relationship between the respondents. Mantell observed that although Brendan and his mother related through "uninterrupted physical and emotional intimacy." the relationship was "a dyad and father is an outsider to this unit." Mantell also noted that father was much more interested in his own issues with the department than in engaging his son. Mantell found that it was "increasingly impossible to follow his [father's] pressured and obsessive dialogue." Mantell concluded:
 The prognosis individually, and also in their parent and child as well as in their adult relationships, is very poor. I see little likelihood that the parents themselves will satisfactorily stabilize as a parental unit within the foreseeable future and I see little likelihood that they will be able to rehabilitate in a way that will enable them to parent Brendan.
CT Page 15330-ax
During his psychosexual evaluation of mother in August, 2001Z Stevens, commenting on the intimacy of the mother-child relationship, concluded:
 Even if she does not engage in overtly sexual behavior with him, her deep feelings for him and reported history of poor sexual boundaries in other areas raise questions about whether she will provide him with the proper degree of privacy and individual "space" as he grows, should she be given unsupervised contact with him. This kind of chronic and excessive "hovering" can be almost as detrimental to a young man's social, sexual, and emotional development as overt sexual touching, and much harder for him to resist since it often looks like "being a good mother" to the outside world.
As previously noted. Stevens was quite concerned as to mother's ability to properly parent Brendan given her intimate involvement with her child, especially in light of her history with her older children and her failure to disclose the same to her therapist.
As to father. Stevens, in referring to father's history of impulsivity, anger and controlling behavior, observed:
 While this pattern of attempting to control others and impulsive responding to anger-inducing situations is problematic, his pattern of holding other people responsible for his actions is even more of a concern.
Stevens then concluded:
 This lack of responsibility-taking raises questions about his future behavior with respect to both physical violence and sexual behavior. As things currently stand, it seems unlikely that he will change much about how he deals with his anger. since he perceives that other people are the problem, not he. Indicative of this concern is his desire for marital therapy so that someone else will see what a problem Brenda is for him and how badly she acts with him, rather than finding ways for himself to change himself pith respect to his relationship with Brenda. Similarly, it is likely that he will continue to CT Page 15330-ay engage in unconventional sexual behavior, because he perceives that he is not really responsible for any problems which might then ensue.
Stevens expressed concern as to father's ability to achieve that rehabilitative level necessary to properly parent Brendan given father's extensive history of self-defeating behaviors.
During the trial, Cox-Lindenbeaum testified that the recommended treatment for sexually-offending behavior, particularly in cases where children have been victims, is both intensive and prolonged, lasting up to seven years. Mother offered no evidence as to her participation in such treatment. Father offered letters from Massachusetts officials indicating successful completion of his probation and containing an opinion that he would not reoffend.[12] Father, however, offered no evidence as to the nature, extent and duration of any therapy he might have received and refused to execute a release to allow the department to obtain that information.
As to the second statutory prong, this court finds that the petitioner has proven by clear and convincing evidence that given the age and special needs of Brendan there is no reason to believe that either parent could assume a responsible position in Brendan's life now or in the future. Respondents lack anything close to the requisite parenting skills; they lack both the capability and the motivation to attain those skills; they were not at the time of Brendan's removal, at the time of his commitment and at the time of the filing of the termination petition, capable of properly and safely parenting their son. They do not at the present time have that capability nor will, they ever achieve that capability. The evidence clearly and convincingly compels that conclusion.
 C. Acts or Omissions
Petitioner alleges as a second statutory ground for termination of respondents' parental rights that, due to parental acts of commission or omission, Brendan has been denied the care, guidance or control necessary for his physical, educational, moral or emotional well-being. The statute provides, as indicators of the requisite acts of commission, severe physical abuse, a pattern of physical abuse, sexual molestation and sexual exploitation.[13] The list, however, is specifically not limited to those examples. Moreover, the statute provides that serious physical injury sustained by a child by non-accidental or inadequately explained means constitutes prima facie evidence of the requisite parental acts. The statute authorizes the termination of parental rights where parental CT Page 15330-bz acts have resulted in serious physical or emotional injury to the child.In re Lauren R., 49 Conn. App. 763, 773 (1998).
There has been no evidence that Brendan suffered serious physical injury at the hands of his parents, however, there is ample evidence, including the child's statements to evaluators and the respondents' admissions, that he was physically abused by his parents. Moreover, his statements to his therapist and to Cox-Lindenbeaum reveal that he accepted the physical abuse as a way of life. Physical abuse of the child occurred on two separate occasions after the department became involved with this family, thus, despite involvement of governmental agencies, including law enforcement, that way of life continued. There is also ample evidence that the parenting practices of the respondents as well as the physical abuse of the child by them contributed substantially to the child's present emotional state. This court finds that the petitioner has proven by clear and convincing evidence that the respondents engaged in a pattern of physical abuse relative to Brendan which resulted in the denial of that degree of care, guidance and control necessary for his physical and emotional well-being. This court further finds by clear and convincing evidence that the respondents' physical abuse and parenting practices resulted in serious emotional injury to the child.
There has been substantial circumstantial evidence which prompts suspicion by the child's therapist, medical personnel and professional evaluators that mother and/or father have sexually molested Brendan, of concern is Brendan's sexually-related behaviors, including touching himself and others in private places and spying on others in bedrooms and bathrooms. Significant also is his lashing out during sleep and his visceral reaction to am attempt to explore his unusual and disturbing behaviors. These factors and others caused Cox-Lindenbeaum to strongly suspect that Brendan was sexually abused. Add to those concerns, the troubling sexually-offending history of the respondents and their refusal to fully disclose that history and the evidence is all the more persuasive.
The evidence of sexual abuse of Brendan by his parents, however persuasive, does not rise to the level required; it is not clear and convincing as to this issue. To be "clear and convincing" the evidence must induce in the trier's mind a belief that what is asserted is "highly probably true." Dacey v. Connecticut Bar Association, 170 Conn. 520, 537
(1976). The evidence of sexual molestation does not, this court finds, meet that standard.
For the reasons stated herein, as to physical abuse only, this court does find that petitioner has met its burden relative to the second CT Page 15330-ba statutory ground for termination of the respondents' parental rights.
V. DISPOSITION
 A. Best Interest
Now that the court has found in the adjudication stage that the petitioner has proven each of the statutory grounds alleged by clear and convincing evidence, this court must consider whether termination of the parental rights of the respondents is in the best interest of Brendan. The burden remains with the petitioner who must convince the court that termination is, in fact, in the child's best interest. In making its determination as to best interest, the trial court may take into account not only events preceding the filing of the present petition, but may consider all events up to the conclusion of the trial. Practice Book § 33-3. Each case must be decided on its particular facts and circumstances as it has been held that the determination of whether to terminate parental rights is a highly fact-specific process. See In reShane P., supra, 58 Conn. App. 254.
"The desire and right of a parent to maintain a familial relationship with a child cannot be separated from the desire and best interest of a child either to maintain or to abandon that relationship, or the interest of the state in safeguarding the welfare of children. These legitimate interest of parent, child and state require a balancing of the factors involved in those interests." In re Shaquanna M., 61 Conn. App. 592,598-99 (2001). "In every case involving parental rights, a struggle exists between parents and the state to determine what is in the child's best interest, the child being the focus of the struggle." (Internal quotation marks omitted.) In re Dorrell R., 64 Conn. App. 455, 467
(2001).
 "`The trial court is vested with broad discretion in determining what is in the child's best interests. Presutti v. Presutti, 181 Conn. 622, 627, 436 A.2d 299
(1980); Ridgeway v. Ridgeway, 180 Conn. 533, 541, 429 A.2d 801 (1980).' Schult v. Schult, 241 Conn. 767, 777-78, 699 A.2d 134 (1997). Conducting a best interest analysis is not a narrow concept restricted to compelling reason or to fully reuniting the parent with the child. Rather, it is `purposefully broad to enable the trial court to exercise its discretion based upon a host of considerations.' In re Bruce R., [234 Conn. 194, 206 (1995)]." In re Alissa N., 56 Conn. App. 203, 208 (1999) cert. denied 252 Conn. 952
CT Page 15330-bb (2000)
The department's court-approved permanency plan for Brendan is the termination of the parental rights of the respondents and adoption by persons who would be capable of properly caring for him and understanding, and tending, to his special needs. Ms. Marquis, the department case-worker, testified that the department sees this plan as a viable option despite Brendan's current institutional placement. The department is optimistic that a safe, nurturing home can be found for this child, although concedes that Brendan will require well into the future, "exceptional" parenting and strong therapeutic supports. The department will utilize the resources available to it, including the Permanency Service Program (PPSP). The Office for Foster and Adoption Services (OFAS). Casey Family Services, and the Adoption Resource Exchange, to locate the appropriate adoptive home for this child.
The respondents argue that the department's plan is premature in that Brendan has only recently transferred to a residential setting, which historically requires an average stay of from one to two years. Mother asserts that the nature of Brendan's placement is uncertain and subject to change. There is no guarantee that he will be adopted by another family, particularly given his past history of foster failures. Mother admits that the trial has been a learning process for her and her husband. Mother claims that she is now more aware of Brendan's special needs, although she neglected to include the diagnosis of post traumatic stress syndrome when asked to specify the child's mental disorders. Both parents express love and affection for Brendan, with father stating that "my son is my life and my world." Father admits to his stormy relationship with the department, admits that he has physically abused his son and admits that he has not accessed the court-ordered services necessary to improve upon his parenting practices. Father, however, on the last day of trial, stated that he is now "older and wiser" and now realizes that he needs to be educated as to Brendan's parenting requirements. Both parents fail to realize that they needed to address their own shortcomings, their disturbing past and their conflicted relationship prior to being, in a position to learn about the requisite skills necessary to care for Brendan.
During one of her rare visits at St. Francis Care, mother told Brendan. "you need to get better" in response to the child asking when he could return home. The fact is that it was the respondents who needed to get "better" — much better — at parenting their child.
Brendan's therapist recommended termination of the respondents' parental rights even though, she opined, the child's chances for placement CT Page 15330-bc within a normal family setting, are "fair to poor." believing, that Brendan was "nowhere close to being, in a family environment." She testified that if Brendan is to have a chance for a successful familial placement, which was the desirable primary goal, the prospect of divided loyalty needed to be eliminated. Termination of the respondents' parental rights would avoid any future conflict in the child's allegiance to his biological parents while trying to form a relationship with adopting parents.
Cox-Lindenbeaum confirmed that Brendan expressed love for his parents; he accepted their physical abuse because he loves them; he blamed himself for his removal from his parents' residence and was hopeful of returning to their care. She opined, however, that while residing, with the respondents, physical beatings were a way of life and that, most probably, sexual abuse was also perpetrated.
Mantell recommended that the respondents' parental rights be terminated, despite there being, "no clear outcome" for Brendan and despite believing that the respondents are Brendan's psychological parents and that a strong parent/child bond still exists. He testified that mother and father "do not know what to do and are not able to develop the skills necessary to parent this difficult child with his special needs." Mantell agreed that adoption is a viable and preferable goal for Brendan, lie testified that in his professional experience, he has witnessed children with far greater emotional disturbance than Brendan successfully placed in therapeutic foster homes and ultimately adopted by families with the requisite parental skills to tend to their special needs. He believed that there are "people out there" willing and capable of providing appropriate care for Brendan. Mantell recommended that the department utilize agencies such as Casey Family Services to initially locate a therapeutic foster home appropriate for Brendan's needs in which his care would be supervised by mental health professionals who are experienced in the treatment of children from dysfunctional families and families with a history of sexual abuse. Mantell, noting, Brendan's "strong attachment" to his parents and referring, to termination in this case as "a radical form of surgery," nevertheless, opined that termination and adoption was the most appropriate plan for Brendan and was in Brendan's best interest. Mantell concluded that given the child's special needs and the inability of the respondents to acquire the requisite parenting skills which those needs demanded, termination was the only alternative. The "[p]sychological testimony from professionals is rightly accorded great weight" in termination proceedings. (Internal quotation marks omitted.) In re EdenF., supra, 250 Conn. 707; In re Juvenile Appeal, 177 Conn. 648, 667
(1979). CT Page 15330-bd
Despite Mantell's recommendation, however, he agrees with the child's therapist that some post termination contact with his parents is therapeutically desirable. The therapist testified as to her belief that any statement to Brendan that his parents were no longer his parents would have "a devastating impact" on the child. Brendan's therapist recommended what is, in effect, a de-facto termination by way of a therapeutic last goodbye. Mantell testified that any post termination contact by the child with his parents should be therapeutically orchestrated and be viewed as a therapeutic option to whomever his future custodian may be. Such post termination contact will, naturally and essentially, require the parents optimal cooperation — a goal which has heretobefore been unattainable. The court has addressed this post termination issue not only because it was raised by the professional witnesses, but because it serves as a basis for the respondents argument against termination. Respondents urge the court not to order termination because of Brendan's uncertain future and because that future has been therapeutically recommended to include them due to the strong continuing bond with their son and despite their past failures. However, our courts have consistently held that once the adjudicatory phase has been addressed and the statutory ground has been proven, the issue to be determined in the dispositional phase is whether termination is in the child's best interest. The issue is not whom shall have custody or where the child shall reside or the nature of the child's placement. Those later determinations will be made in future proceedings. In re CarissaK., 55 Conn. App. 768, 776 (1999). Although adoption, as uncertain as it may be in this case, is the current professionally recommended plan and the preferred out come under federal and state policy once termination is ordered, it is not a pre-requisite for termination. Adoption provides one option for achieving, long, term stability in a child's life; it is not the sole answer. In re Eden F., supra, 250 Conn. 709.
Whether the ultimate answer for Brendan is adoption, a therapeutic foster home or some other viable long term placement, this court finds that Brendan's best interest lies in the termination of the respondent's parental rights. This court possesses no authority to orchestrate the circumstances of post-termination parental contact and will leave that issue in the hands of those most qualified to deal with it, i.e., the mental health professionals tending to Brendan's needs.
This court finds that the petitioner has proven by clear and convincing evidence that termination of the respondent's parental rights are in the best interest of Brendan D.
 B. The Statutory Factors
CT Page 15330-be
In making its determination as to whether termination is in Brendan s best interest the court is mandated to consider and has considered the seven factors provided in General Statutes § 17a-112 (k). These factors serve as guidelines to assist the court in arriving at its decision; proof of each factor by clear and convincing evidence is not required. In re Quanitra M., 60 Conn. App. 96, 104, cert. denied,255 Conn. 903 (2000).
(1) The timeliness, nature and extent of services offered:
Appropriate and timely services were provided to the respondents by the department including case management services, supervisors for visitation, transportation for visitation, vouchers, mileage reimbursement, substance abuse evaluations and several mental health evaluations. Mental health counseling was offered to the respondents through United Services. New Perceptions, the Uconn Center For Marriage and Families and private practitioners. Although the respondents attended and completed a basic parenting course, they failed to achieve anything close to the skills necessary to parent Brendan. Mother attended some therapy, father refused to engage in individual therapy. Both parents refused to cooperate with the department which closed the door to other possible rehabilitative services.
(2) Reasonable efforts to reunite:
Such efforts are mandated by the Federal Adoption Assistance and Child Welfare Act and the Adoption and Safe Families Act of 1997,42 U.S.C. § 670 et seq., and Connecticut's termination statute, § 17a-112 (j)(1). This court has earlier herein found that such efforts were made by the department consistent with the statutory mandates.
(3) Fulfillment of court-ordered obligations:
This court has also earlier herein described in detail the lack of compliance of both respondents with the statutorily mandated steps issued by Judge Mack on May 30, 2000. This court has noted their lack of cooperation with the department relative to releases, services and home visits. This court has noted father's inappropriate behavior which caused the department to cease visitation transportation. Noted also was the respondents' refusal to engage in a substance abuse evaluation and their post commitment criminal offenses. Father's dismal performance in the court-ordered domestic violence program and his failure to access individual counseling has been mentioned as was mother's poor record CT Page 15330-bf relative to her therapy. This court finds that the department has fulfilled its obligations to provide services while the respondents have failed to make use of those services.
(4) The feelings and emotional ties between the child and the respondents:
There is no question that Brendan loves his parents and that the respondents love their child. Mantell reported that the respondents are Brendan's psychological parents and that a strong parent/child bond exits. Cox-Lindenbeaum testified that the child expressed love for his parents. Bonding, however, in and of itself, is not a sufficient reason to find that termination is not in Brendan's best interest. In re QuanitraM., supra, 60 Conn. App. 106. Although the respondents clearly love Brendan and desire, at some future date, his return, parental love and biological connection are not enough to justify the retention of their parental rights. In re Ashley S., 61 Conn. App. 658, 667, cert. denied.255 Conn. 950 (2001).
(5) The age of the child:
Brendan is currently nine years of age. He has been out of his parents' care for nearly two and one-half years. Federal and state statutory policy envision the implementation of a permanent place for a child after only twelve months in temporary care. For Brendan, the implementation of the permanency plan of termination and adoption is long overdue. Any impediments to attaining the same must be removed. Termination of the respondent's parental rights is a necessary step in that direction.
(6) Efforts of the respondents to adjust their circumstances, conduct andconditions:
The opportunity of the respondents to be in a position to have Brendan returned to their care was open to them by adherence to the court-ordered steps, by cooperation with the department and by bringing order to their chaotic life style. The respondents, as described earlier herein in great detail, chose not to seize that opportunity and failed to make the necessary improvements in their parenting capacities and practices., failed to refrain from further criminal involvement and failed to take even minimal measures to alter their living, conditions. Sixteen months after Brendan's removal from their care, the respondents themselves admitted they were in no position to parent their child. At that time. Mantell observed that their lives were even more unstable than at the time of his earlier evaluation. They have not, cannot and will not achieve the stability required to be a parental source for Brendan. CT Page 15330-bg
(7) Prevention of meaningful relationship by others:
This court finds that no department personnel have engaged in any unreasonable act that prevented the respondents from maintaining a meaningful relationship with Brendan. As noted, it was father's unreasonable conduct which resulted in the elimination of the department as a transportation source for visitation while the child was in Portland. Subsequent thereto, while the privilege to visit their child remained in effect, it was the respondents who allowed the inconvenience of the journey to take priority over the desire to see their son. Moreover, the respondents took no steps to improve their economic status and remained in a one room rooming house throughout the pendency of the termination case. Mother and father have no one to blame but themselves for the permanent removal of Brendan from their care.
VI. CONCLUSION
This court finds by clear and convincing, evidence that termination of the parental rights of both respondents is in Brendan's best interest. They have amply demonstrated their inability to achieve any capacity to provide Brendan with a safe, healthy, nurturing home. They are completely lacking of any skills necessary to appropriately parent a child who exhibits a variety of disturbing behaviors and who requires expertise in a caretaker that is well beyond what the respondents are capable of achieving. Brendan and his current providers need to work toward the attainment of the permanency plan without further delay or impediment.
VII. ORDERS
Based on the foregoing, it is:
ORDERED that the parental rights of Albert D. and Brenda D. because of their failure to achieve that degree of rehabilitation referred to in § 17a-112 (j)(3)(B)(i) and because of the commission of acts constituting a pattern of abuse resulting in serious emotional injury, as referred to in § 17a-112 (j)(3)(C), be and are hereby terminated with respect to their minor child, Brendan D.
ORDERED that the commissioner of the department of children and families is hereby appointed statutory parent for said child who shall submit to the Superior Court for Juvenile Matters at Willimantic, within thirty days of the date of this memorandum, a case plan, and, thereafter such further reports as may be required by law until Brendan's permanency plan is fulfilled. CT Page 15330-bh
 ___________________ WILSON J. TROMBLEY JUDGE OF THE SUPERIOR COURT